UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STEPHEN PENNYMAN,
*Plaintiff*,

v.

No. 3:22-cv-1552 (JAM)

ANGEL QUIROS *et al.*,
*Defendants*.

**INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A**

Plaintiff Stephen Pennyman is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He has filed a complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983 against seven prison officials. He primarily alleges that they were deliberately indifferent to his safety and serious medical needs, resulting in his contracting COVID-19 on two occasions. Based on my initial review of the complaint pursuant to 28 U.S.C. § 1915A, I conclude that his claims may proceed at this time.

### BACKGROUND

The facts alleged in the complaint are accepted as true for the purposes of initial review only. For at least 30 days after the pandemic began, Pennyman was permitted only 30 minutes of out-of-cell time per day.[1] As a result of the lack of recreation, he gained 45 pounds.[2]

In July 2020, Pennyman was transferred to MacDougall Correctional Institution ("MacDougall") and housed in O-pod.[3] In October 2020, he was moved from O-pod to H-2-pod.[4] Pennyman alleges that no precautions against the spread of COVID-19 were being taken at this time.[5]

---

[1] Doc. #1 at 8 (¶ 15).
[2] *Ibid*. (¶ 15).
[3] *Id.* at 9 (¶ 17).
[4] *Ibid*. (¶ 18).
[5] *Ibid*. (¶ 19).

1

From October to December 2020, MacDougall Warden Kristen Barone permitted correctional officers to work in multiple units even though she was aware of the "rapid spread/infection rate of COVID-19."[6] Pennyman first contracted COVID-19 between the end of November 2020 and December 23, 2020, at a time when about 75% of the H-2-pod was testing positive for the virus.[7] Barone permitted officers to work in both the quarantine unit for COVID-19-positive inmates and the units for uninfected inmates, which caused the virus to spread throughout MacDougall.[8]

Pennyman alleges that, because inmates were not permitted to contact inmates in other housing units, the source of the spread of COVID-19 in MacDougall was the correctional officers working in multiple units, who were not required to wear masks.[9] Moreover, Barone and former Deputy Warden of MacDougall Joe Roach provided inmates only one mask every one to two weeks.[10] Pennyman also alleges that Barone, Roach, and DOC Commissioner Angel Quiros failed to implement protocols and rules to restrict the spread of the virus.[11]

On December 19, 2020, Pennyman's cellmate tested positive for COVID-19, and Pennyman tested negative.[12] Pennyman was left in an infected cell after his cellmate was removed.[13] Pennyman felt sick the next day and asked to be tested but was told by correctional and medical staff that he had to wait to be tested again.[14] On December 23, 2020, Pennyman tested positive for COVID-19.[15] Pennyman was held in quarantine in O-pod for two weeks.[16] He

---

[6] *Ibid.* (¶ 20); *see also id.* at 5 (¶ 7) (identifying Barone as Warden of MacDougal).
[7] *Id.* at 10 (¶ 21).
[8] *Ibid.* (¶ 22).
[9] *Ibid.* (¶¶ 23–24).
[10] *Id.* at 17 (¶ 48); *id.* at 5 (¶ 8) (identifying Roach as former Deputy Warden of MacDougall).
[11] *Id.* at 10 (¶ 24), 11–14 (¶¶ 29–34); *see also id.* at 3 (¶ 2) (identifying Quiros as DOC Commissioner).
[12] *Id.* at 11 (¶ 25).
[13] *Ibid.* (¶ 25).
[14] *Ibid.* (¶¶ 26–27).
[15] *Ibid.* (¶ 28).
[16] *Id.* at 14 (¶ 36).

experienced body aches, cold sweats, diarrhea, headaches, shortness of breath, and dizziness, and on some days was unable to get out of bed.[17] At some point while Pennyman was incarcerated at MacDougall, he received a two-dose COVID-19 vaccine.[18]

On October 20, 2021, Pennyman was transferred to Osborn Correctional Institution ("Osborn") and housed in E-Block.[19] After he was released from segregation, Pennyman was housed in cell 22 in D-Block.[20] Multiple inmates in D-Block were testing positive for COVID-19.[21] Osborn did not have a quarantine unit, so infected inmates were placed in any block with open cells.[22] Infected inmates placed in D-block spread COVID-19 within the unit.[23]

Defendants Quiros, Acting Warden of Osborn Oles, Osborn Deputy Warden Ortyl, and Lieutenant Cry (the manager and overseer of D-Block) did nothing to address this situation despite having notice of the infection rate.[24] Defendants Oles, Ortyl, and Cry provided inmates only one mask per week—a policy approved by Quiros.[25]

Pennyman submitted multiple inmate requests between November 4, 2021 and January 24, 2022 regarding the prevalence of COVID-19 infections in D-Block.[26] On December 17, 2021, Pennyman again tested positive for COVID-19.[27]

---

[17] *Id.* at 13 (¶ 32), 14 (¶ 35).
[18] *Id.* at 15 (¶ 37).
[19] *Ibid.* (¶ 38).
[20] *Ibid.* (¶ 39).
[21] *Ibid.* (¶ 40).
[22] *Ibid.* (¶ 41).
[23] *Ibid.* (¶ 42).
[24] *Id.* at 15–16 (¶ 43); *see also id.* at 2 (identifying Oles as Acting Warden of Osborn), 4 (¶ 4) (identifying Ortyl as Deputy Warden of Osborn), 5 (¶ 6) (identifying Cry as "Lt. at Osborn C.I. and the unit manager of the D-unit as Osborn C.I.").
[25] *Id.* at 17 (¶ 46).
[26] *Id.* at 16 (¶ 44).
[27] *Ibid.* (¶ 45).

Pennyman alleges that despite having been briefed on the dangers that COVID-19 posed to the inmate population, all seven defendants took part in formulating policies that led to, or failed to prevent, the unsafe prison conditions of which he complains.[28]

Pennyman alleges four Eighth Amendment claims based on the defendants' handling of the COVID-19 pandemic: deliberate indifference to his safety, failure to protect, unconstitutional conditions of confinement, and cruel and unusual punishment.[29] Pennyman names DOC Commissioner Angel Quiros, former DOC Commissioner Rollin Cook, MacDougall Warden Kristen Barone, and Osborn Acting Warden Oles in their official and individual capacities and the remaining defendants—Osborn Deputy Warden Ortyl, Osborn Lieutenant Cry, and former Deputy Warden of MacDougall Joe Roach—in their individual capacities.[30] He seeks compensatory and punitive damages, injunctive relief, and declaratory relief.[31]

## DISCUSSION

Congress by law requires that a federal court conduct an initial review of a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments they suggest. *See Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir.

---

[28] *Id.* at 3–5 (¶¶ 2–8), 18 (¶¶ 49–50).
[29] *Id.* at 1, 21–24 (¶¶ 63–70).
[30] *Id.* at 1, 3–5 (¶¶ 2–8).
[31] *Id.* at 1, 22–24 (¶¶ 66–73).

2020) (*per curiam*).[32] Still, even a *pro se* complaint may not survive dismissal if its factual allegations do not establish plausible grounds for relief. *Ibid*.

Although Pennyman alleges four claims in his complaint, all four allege that the defendants violated the Eighth Amendment in their handling of the COVID-19 pandemic. These four claims state a single claim: an Eighth Amendment claim that the defendants were deliberately indifferent to Pennyman's health and safety as a result of unsafe conditions of confinement caused by the failure to institute protocols to protect him from contracting COVID-19. Accordingly, I will construe Pennyman's complaint as alleging a single Eighth Amendment claim.

"To state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with deliberate indifference." *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020). In light of Pennyman's allegation that he twice contracted COVID-19, it appears he has satisfied the objective component of the test. *Cf. Jackson v. Walker*, 2022 WL 16573562 (D. Conn. 2022) (finding that, for purposes of initial review, plaintiff satisfied objective prong of deliberate indifference claim regarding prison officials' handling of the COVID-19 pandemic where plaintiff alleged that he contracted COVID-19 as a result of inadequate safety measures).

As to the subjective component of an Eighth Amendment claim, "[d]eliberate indifference under the Eighth Amendment standard means the official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he

---

[32] Unless otherwise indicated, this order omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

must also draw the inference." *Ibid*. "Deliberate indifference is more than negligence—it requires a showing that the prison official knew of, and disregarded, an excessive risk to inmate health or safety from the challenged condition of confinement." *Edwards v. Quiros*, 986 F.3d 187, 192 (2d Cir. 2021).

Pennyman alleges that the defendants permitted staff to work both in units containing infected inmates and units containing uninfected inmates, did not enforce mask mandates, and provided only one mask to each inmate every one to two weeks. He also alleges that Osborn did not have a quarantine unit and housed infected inmates among uninfected inmates.

Pennyman describes all seven defendants as supervisory officials.[33] The Second Circuit has held that "there is no special rule for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Instead, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ibid.*

Accordingly, for deliberate indifference claims, "the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Id*. at 616. Although a supervisor cannot be found liable solely "by reason of [his] supervision of others who committed the violation," *id.* at 619, "it seemingly remains possible for a policy maker to be held liable for his creation or continuance of an unconstitutional policy or custom," *Jok v. City of Burlington*, 2022 WL 444361, at *11 (D. Vt. 2022).

Pennyman alleges that each defendant was aware of the risk that COVID-19 posed to inmates but allowed unsafe policies to continue and failed to institute policies or practices in the areas under their control, be it the entire DOC, a particular correctional facility, or a housing unit. Pennyman further alleges that he submitted multiple grievances complaining about the lack of

---

[33] *See* Doc. #1 at 3–5 (¶¶ 2–8).

safety precautions. At this stage of the litigation, and mindful of the Second Circuit's directive that *pro se* pleadings be liberally construed, I conclude that Pennyman's claims would benefit from further development of the record and the adversarial process. Accordingly, the claims will proceed at this time. The defendants may file a motion to dismiss if they believe the allegations fail to state a claim for relief.

## CONCLUSION

For the reasons set forth above, Pennyman's Eighth Amendment claim against the defendants will proceed. Accordingly, the Court enters the following orders.

(1) **The Clerk shall** contact the Department of Correction Office of Legal Affairs to ascertain current service addresses for each defendant, mail a waiver of service of process request packet containing the Complaint and this Order to each defendant at the address provided within **twenty-one (21) days** of this Order, and report to the Court on the status of the waiver requests on the thirty-fifth day after mailing. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on the defendant in his or her individual capacity and the defendant shall be required to pay the cost of such service in accordance with Federal Rule of Civil Procedure 4(d).

(2) **The Clerk shall** prepare a summons form and send an official capacity service packet to the U.S. Marshals Service. The U.S. Marshals Service is directed to effect service of the Complaint on defendants Quiros, Barone, Cook, and Oles in their official capacities at the Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106, within **twenty-one (21) days** from the date of this order and to file a return of service within thirty (30) days from the date of this order.

(3) **The Clerk shall** send Pennyman a copy of this Order.

(4) **The Clerk shall** send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(5) The defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above. They also may include all additional defenses permitted by the Federal Rules.

(6) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this order. Discovery requests need not be filed with the court.

(7) All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this order.

(8) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(9) If Pennyman changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)(2) provides that he MUST notify the court. **Failure to do so can result in the dismissal of the case.** Pennyman must give notice of a new address even if he is incarcerated. Pennyman should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter

without indicating that it is a new address. If Pennyman has more than one pending case, he should indicate all the case numbers in the notification of change of address. Pennyman should also notify the defendants or the attorney for the defendants of his new address.

(10) The Clerk shall immediately enter the District of Connecticut Standing Order Re: Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall send a copy to Pennyman.

(11) Pennyman shall utilize the Prisoner Efiling Program when filing documents with the court. Pennyman is advised that the Program may be used only to file documents with the court. Given that local court rules provide that discovery requests are not filed with the court, discovery requests must be served on defendants' counsel by regular mail.

It is so ordered.

Dated at New Haven this 31st day of May 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge